Good morning, your honors. It's a whole new world out there now. It certainly is. My name is Michael Doubt, and I represent the plaintiff appellant, Paul Gannon. And Mr. Gannon seeks review of the district court's denial of class certification of his claims against Network Telephone Services, which we refer to as NTS. You have to talk into the microphone. Am I... Is this better? I know you're tall. Okay. Yeah, I'm bleeding into it here. Under the... His claims under the Telephone Consumer Protection Act. Let me... I think we're familiar with the record in this case. Let me ask you this. Mr. Gannon, as I understand it, called the phone line and then relatively immediately hung up, correct? That is our understanding of facts, yes. With the record. That's what the allegation is. And the record's not clear about whether he heard the so-called mid-amble or not. Am I right on that? I don't think the record is clear on that. Okay. But at least... I want to ask you about typicality here. It seems to me there's at least three types of people in this class, maybe more. One are the people who read the advertisement, which told them what would happen, called the line, heard the mid-amble, and then later got these messages. There are people who didn't read the advertisement but called the line and heard the mid-amble and got these unwanted, so-called unwanted text messages. And then there's Mr. Gannon, who seems to me to be fairly unique in terms of his situation, which is that he stopped right away. And as to all of them, the question is whether there's expressed consent. And there's different arguments as to each. Your position is there's not expressed consent as to anyone, and you may be right, but the other side argues that there is. Why is your client typical of the class because he doesn't have defenses against the rest of the class, successful or unsuccessful, that don't exist with respect to your client? Well, Your Honor, I think that the fact that there aren't the same defenses available against his claims does not render his fundamental claims typical. Well, as close as I can tell, as to your client, I don't know if they have any defense at all. But they've got defenses as to these other people. They may turn out to be not good defenses. You know, if these people brought claims, the court might say this isn't expressed consent, it's simply implied consent, but they're different. And so why is he the right class representative for a class of people who are very differently situated? Well, Your Honor, I think that argument would be, I'm inferring an argument, that he would not satisfy typicality, which is not something the district court found. Right, but we can deal on any basis of the record. Understood. But that argument, I think, would work a lot better if Mr. Gannon were subject to unique defenses that other class members were not subject to, because then you would be in a situation where the court would be faced with potentially prejudicing other class members on the basis of a flawed class representative. Why would he be a vigorous advocate against those other defenses that don't apply to him? Well, Your Honor, I think that the, well, in terms of whether or not he's going to be a vigorous advocate on behalf of people who don't have, or who are subject to those defenses, doesn't strike me as really a typicality argument. It might be adequacy. Yeah, maybe it's an adequacy argument, but here's my problem. As to almost everybody else in the class, I think Mr. Gannon's in a rather unique situation, which is that you called the wrong number, apparently, at least he alleges that he did. As to everybody else in the class, there's some argument about consent. I don't know how many people there are in it, the thousands of people that are in the alleged class. There's some argument about consent. In his case, there doesn't seem to be any argument about consent. And so why is he an adequate representative of people for whom the only issue in the case will be consent? Well, Your Honor, I mean, I don't think that the defendants have conceded that they do not have a consent defense. No, no, and the defendants believe they do have a consent defense. That will be the essential issue with respect to everybody else in the class, but not your client. But it just seems that you have to make an individualized question regarding the consent. I mean, how can we be sure that some of the folks who heard the recording or read the printed ad did not want to receive the messages from NTS? Your Honor, their subjective intent about what they wanted is not the test for determining prior express consent as is required under the TCPA. But it just seems like every case is different. You've got to answer the question individually on express consent. There have been a number of cases that have articulated that basic idea that because there are diverse ways in which consent may have been obtained that we're not going to certify a class. But those cases are different than this case, and the reason is because in each of those cases there was an actual affirmative act on behalf at least of either the plaintiffs or the class members that expressly communicated their telephone number to the calling party. And all those cases, either directly or indirectly, rely under those circumstances on the 1992 FCC order, which has been quoted. And it's paragraph 31 of that order in particular that stated that we're going to find that we as the FCC are interpreting prior express consent as... Do we have to give some deference to the FCC's definition of prior express consent? Well, whether you do or not, we still win. And the reason is because under the same paragraph 31 they said, yes, if you provide, if you knowingly provide your telephone number, we're going to regard that as consent. Is there any prior case that deals with this circumstance? In other words, their contention, I take it, although it's obviously on class certification, is that what most members of the class did translated to willingly providing their telephone number. Your contention is that it's not. That issue will have to be litigated, I think, and that's why I wonder about your client as an appropriate representative. But my question is, is there any case that deals with this precise situation? I do not think there is, Your Honor. I couldn't find one. Let me ask you this. Where would he get the list of the names of potential class members? Your Honor, there are a variety of ways we didn't get into that. We actually have all of the telephone numbers. Those were produced in discovery. NTS kept a list of every single telephone number. There were almost 3.7 million of these telephone numbers. You have that list? Yes. How did you get it? It was provided to us by the defendant, by NTS, in discovery. But some of those people maybe wanted to receive the text. They don't want to get close to this case. They may not. I don't know, Your Honor. I mean, the issue is I don't know that they would necessarily have to be exposed, if that's the concern of the court. But some of these people might have wanted the text, right? And they wouldn't be proper people in your class. They may have had a subjective intent to want to receive a text. That is certainly possible. But in no case did they provide, did they take an affirmative act that communicated their telephone number within the meaning of But that's the question, isn't it? And what you've told me is that there's no case that you extrapolate from the FCC's ruling. I was trying to find the case, but I think last week, and it was in one of the supplemental citations since we've spoken to all of them earlier today, Judge Real came to the opposite conclusion in a case that seemed pretty closely on point. So my point is, without regard to who's right or wrong, that's an issue that was going to be hotly contested, correct? It is. It is, Your Honor. And to go back to my original point, why is your client for whom that is not an issue? There's no indication that he consented in any way. Why is your client an adequate class representative for all the other folks who are going to have to litigate the question of express consent? Well, Your Honor, he stepped up and agreed to serve as a class representative. I mean, I will concede that. Yeah, but that's true in every case, so that doesn't necessarily establish adequacy. Understood. But, again, I mean, I think the cases that deal with typicality or adequacy of a class member that deal with, for one thing, I'm a little bit at a loss on this because we haven't really thoroughly briefed this typicality argument, I don't think. Yeah, so treat it as adequacy because I think they're two sides of the same coin. Right. I would suggest that, again, without having any cases to cite on the tip of my tongue here, that the adequacy issues that relate to unique affirmative defenses really only cut against adequacy when the class representative is subject to unique defenses, not the other way around. Does commonality cut here too? I mean, I know that he has the same claim as everybody else, but there are different defenses. Does that bear on commonality? The commonality issue only really presents a problem. No, because the common... Well, what's the common question then? The common question, there are a number of common questions in this case. Well, but if there are a number of common questions and a whole bunch of different answers, doesn't that, we need a... You can't have a, you know, if you had 20 common questions and people answered them, that would defeat commonality, I would think. Right, but that... So what is the common question? What is the common question here? Yeah, what question? Frame the question that could be answered and then handle this class. The defendant, Network Telephone Services, engaged in a common course of conduct with respect to everyone. It put out print advertisements... But what's the question? Tell me the comment. What's the question? The question is with respect to, as it relates to this issue that's been, you know, hotly contested here, the common question is, was there... Did any of the class members provide prior consent, express consent? Okay, the question is, was there prior express consent? Right. If that would answer it for everyone, but what I'm saying is, it seems like you've got all... You'd have to, in every case, look at it and see whether there was prior express consent. Your Honor, I mean... Because these people, there's so many different ways that people could get the answer, get the text. I disagree respectfully, Your Honor, because... Because we have the defendant here, I mean, your client here, he accidentally called the number. Like, we've all called an 800 number and we go, whoa, I wasn't calling that place. You know, you get off one number and you kind of go... And you hang up. Right. But even for the person who read the ad and saw it, they did not provide prior express consent under both the FCC 1982 order, as it is written, because it explicitly states, while providing the number can constitute consent, capturing a number by the called party cannot constitute consent. But it seems like you'd have to look at every case individually to determine whether there was prior express consent. No, Your Honor, because, again, even for people who read an ad and called that number and read an ad that said, call now and get a text message, all they did was call the telephone number. They never punched in their own telephone number. They never provided their telephone number to NTS in the mere act of calling. If you allow NTS in this case to say, merely by calling us, that's enough of an expression of consent. You are disregarding entirely the FCC's second half of paragraph one of the 1992 FCC order, which says really clearly that you're not going to get consent if all you're doing is capturing the telephone number for somebody that called you. There's going to have to be something more express, more explicit, some further affirmative act beyond the mere fact that I called you for there to be an objectively ascertainable act. But if you could show that they read something before and they read it and then called, would that be express consent? No, Your Honor, not under any case and not under the clear wording of the FCC order, it's not. And that's the issue. We're presenting on this appeal because the court made that determination. But if you were to have properly analyzed this case and said, fine, we'll certify the class and we'll litigate the consent issue, and you look at the wording of the ad that's been put in front of you. How many people do you have in your class right now? There would be approximately 3.7 million class members in this case. But that's the whole list they turned over to you, right? That's correct. Aren't there some people in there that don't belong in there? Isn't this kind of a Wal-Mart situation? No, Your Honor, because in Wal-Mart, every single person actually literally told the clerk at the Wal-Mart drugstore, I think it was, that here's my cell phone number. They gave that to them. Nobody did that here, not a single person. In every case here, the way NTS got the telephone number was by capturing it. They conceded that. Can I ask you? I know your time has run down, but I want to ask you a question. I've read the FCC order. Can you point to me where in the statute the words express consent are? It's in our section 227, I want to say. It's subsection B. And it just says prior express consent. That is 227, so it's 47 U.S.C. 227 sub B 1A. 1A, thank you. And prior express consent is just the phrase used. It's not defined in the rule. The FCC then defines it. The only other really important authority that's applicable here is this court's decision in Satterfield versus Simon and Schuster in 2009 where it said that what we think, the Ninth Circuit thinks prior express consent is expressed that it's an unmistakable expression of consent. And there is no way that you can read the five words in this print advertisement and conclude from that that the scenario that NTS has laid out here constitutes an unmistakable expression of consent. It is at best an ambiguous and unclear expression. We have so many cases, which really surprised me, that if you get some communication, say from even a bank, and it says if you don't answer this, we're treating that as a consent. Well, some courts enforce that. That's not what I learned in law school. And I mean, you've got to affirmatively consent. But what constitutes a consent is this way out somewhere. But let me ask you this. Have you talked to any of these folks since you got everybody's phone number, 3.7 million? Have you called some of them and see if they want to join? And, you know, be named plaintiffs. To my understanding, I'm not the only counsel involved in this case, but to my understanding, none of those people have been called by plaintiff's counsel. By plaintiff's counsel. But you're not plaintiff's counsel. I am, Your Honor. I'm just saying there are multiple plaintiff's counsel involved in the case that aren't here today. But to the best of my understanding, none of those people have been called to determine whether or not they would participate, any of them would be interested in participating. There's quite a large number of telephone numbers. But, you know, I'm just surprised that you've got all those names. Did you send them to you? The list of the 3.6 million numbers were produced. Numbers. You didn't get names. Telephone numbers. Only telephone numbers. There were no names ever associated with it, which is another point, if I may take a few seconds. Hello, ma'am. Has your husband contacted this number? Well, my point is that this consent that NTS claims was provided was anonymous on both sides. Right? There was nothing in the ad and nothing in even the mid-amble that identifies NTS as the party receiving consent. And, likewise, there's nothing on the other side. Well, but you wouldn't be a very different case even absent the identification of the other party if the phone call said, if you want to receive future communications from us, please state your phone number. That would be consent. It's not the absence of identification of the party that you're hanging your hat on. It's the absence of express consent. Well, let me ask. Back there in the audience, do you have any idea what this case is about? I'm sure the lawyers have heard the TCPA. I might get some more class, ma'am. It is extraordinary when you think about it. 3.6 million numbers, that's got to be something like 1% of the whole, I mean, or maybe more of the entire, you've got 45,000 telephone numbers out there. Anyway, it's an incredible number. It's extraordinary because almost nobody, like your client, called this line by mistake. So what's extraordinary is that there's 45 million people who want to hear these messages. That's not necessarily, well. Or at least want to call this phone line. Honestly, we don't know that. I mean, we have no information in this record about how many of these people signed up to become customers or did business with them at all. NTS put in the record a kind of slippery statistic about how, well, based on these 3.7 million, 3.6 million numbers, we got back another 6-plus million telephone calls. So you think some of the court may be recused? They wouldn't even know, Your Honor, because network telephone services nowhere was identified in any of this advertising or the preamble. They wouldn't know who they were dealing with, which also explains why there wasn't any mention of our client in the complaint having made a call in the first place because he had, prior to us filing this lawsuit, we had no idea why he was getting these messages, obviously. Were they charged by the hour? By the minute, I think, Your Honor. Minutes? How much? There's a minimum, isn't there? I don't know enough about their business to know. I'm certainly not a customer, but I think that it's several dollars a minute. But they want your credit card. Indeed, I'm sure they do. All right. Thank you, Your Honor. Thank you. Good morning, Your Honors. Good morning. Benjamin Schatz of Manat, Phelps & Phillips for Defendants and Appalese Network Telephone Services. The question is, did the district court abuse its discretion in denying class certification? And the answer, of course, is no because there are all kinds of problems with this class, this proposed class. There are typicality problems, adequacy problems, and particularly problems with commonality. District court did not do typicality, right? That's correct. The trial judge never even needed to get there. Well, whether he needed to or not, he didn't do it. He did not get there. You are certainly free to do so, and we've made those arguments in the briefing. Let me rephrase your opponent's argument and see if you can respond to it. He says the FCC says you've got to have prior express consent. And this is an easy case because there's no express consent from anyone in the class. If he defines the class as those people who simply called the number and got texts in return. What's your answer to that? Prior express consent is the language in the statute. And here, anyone who saw the advertising, and the advertising says— Isn't this implied consent? No, no, Your Honor. It's expressed because the customer has to affirmatively dial the numbers. If you see an ad that says, call this number and we'll send you a text. And you say, oh, okay, I'll call the number. And then a text is sent to you. You can't say, oh, my goodness, I didn't want that text. That makes no sense. The prior express consent is in calling the number when you know that doing so will result in a text message back to you. That's— What about those who didn't read the ad? Well, then how did they get the phone number? Well, who knows? I mean, how do people get these phone numbers? His friend comes over and says, hey, I've got a great line for you to call, 1-800-TEXT-6. And he calls the number, didn't read the ad. How does he provide a prior express consent? By failing to act? Well, that's, you know, that's definitely a hypothetical beyond the class. Well, but why is he different? Why is that class of people, that subclass of people, different than the plaintiff? Well, if someone calls the number and doesn't know what it is— Right, and so listens and gets, you know, hey, I'm listening. And in the middle of it they say, we're going to send you texts unless you affirmatively opt out, right? Right. How is that prior express consent? I don't think there is prior express consent if somebody calls a number and doesn't know what they're calling. But, of course, that's not this business. Well, he may know what he's calling, but he may not know that he's going to get a text in return. Right, although, of course, when the call is picked up, there is a preamble and a midamble that explains what the line is and also explains that there will be text messages since you've called this line because presumably most people who call know what they're doing and they want it. And there are opt-outs then provided so that if somebody is in the unfortunate situation of mistakenly dialing one of those numbers, it's very easy to just press stop or do any of the means of opting out. How do you opt out? You can opt out by— The record reflects it. Yeah, there are a bunch of ways. You can opt out by—if a text comes in to you and you don't like it, you can say text back stop. If you're on the phone line and you hear the preamble, I think you can press nine and then pound and then that cuts you off. And then there's also the address and the contact information. If your company is available, you can call them and say please. So there are lots of ways of opting out. But the many millions of customers of this service statistically call more than once. I mean, these are not mistakes. These are happy customers who are— Can you be a happy customer and still be entitled to TCPA statutory damages? Well, we don't think so. I mean, it's not the nature of your pleasure that we measure here. It's whether you consent it, right? That's right. But the point is that prior express consent arises from knowingly providing your phone number. And in these instances, if you see an ad that says call and get a text and you call and get a text— Your point is that the second call can't be a violation. Well, certainly not. Because at that point you know what you're doing. Yes, but even the first call, because everybody knows that when you call a number that says we're going to text you, that you have given them your phone number. That's how they text you back. The Pisac case, which you mentioned, that was just put on Westlaw this week, is a perfect example of that. What do you think Chuck Manatt would think about this case? Chuck Manatt of blessed memory. I'm sure he would want us to win. He was a firm believer in— I don't know about this. I knew him well. Yes, as did we. But my point is that calling under those circumstances is express consent. He used to handle a lot of banks. Yes, that's correct. Manatt firm began as a banking firm. We've expanded. When he passed away, all that— We still do plenty of banking work. But we also engage in other federal claims such as TCPA claims. And, of course, this case is not your typical— What was that you just said? The TCPA, the Telephone Consumer Protection Act. It was an act passed by Congress in 1991. And the FCC is in charge of interpreting the statute. And in 1992, they did issue a guidance, a regulation. The problem with that guidance is that in 1992, cell phones looked like bricks and nobody was text messaging. And the whole idea that if you— They were supposed to stop from getting prerecorded messages. Exactly. The point of the capture language was you didn't want to call your department store to find out what time they closed. And then suddenly, for the rest of time, get robocalls back from them on all sorts of offers and things that you don't care about. So that sort of capturing, which you didn't know would happen, and then the responsive calls, that's what the TCPA— Why isn't this just simply a legal issue that the judge could dispose of quickly? He might grant summary judgment. I guess the problem is he can't grant summary judgment in your favor as to Mr. Gannon, who accidentally trips over this. Well, we don't even know that. He never provided— But at least that's his allegation. That's the story that his lawyers put in their motion. Okay. But if that's true, where's the express consent in his case? Well, there might not be any. I mean, if it's truly a mistake, then the Act provides for $500 damages, and that's the end of it. But what the plaintiffs are doing is trying to make this a $5 billion case by saying that every person who was ever texted by NTS never gave consent for that, and therefore the damages add up to ridiculous— Tell me your commonality argument. I'm sorry? Tell me why there's not a common question. There isn't a common question because of the prior express consent issue, because the vast majority of people who call, probably 99.9 percent, know what they're doing, and they're calling because they've seen the advertising. I mean, this whole business is about making telephone calls. So would the only way you would be able to ascertain that was you'd have to call all those people to find out how they got involved? Well, right. That's the manageability problem. How do you have this class? If you call them and say, did you see the ad? Is that why you called? Did you know that you would be getting a text message when you saw the ad that said they would be sending you a text message? Because you could text them. Yes. And that's correct, that we don't have the names. We only have the phone numbers. So what common question did counsel for the appellant argue below? What did he say the common question was? Prior express consent. They are forced to take the position that no one ever gave prior express consent for the text messages. Is there a case that helps us on that, that deals with this precise situation? Everybody's arguing by analogy from other cases. Is there? I think the PIES Act is probably the closest case, and that's the one that we submitted the letter on. The one that was decided last week, published last week in the district court. Yes. That's correct. And again, the point of that case is that texting in response to a promotion and then getting a text back, there's no prior express consent problem because we all know now that when you text or call, the recipient now has your number. And particularly in the advertising context, if you're asking for something and then you get it, you don't have any complaint about that. And in fact, under the most current FCC regulations, that's not even deemed advertising. That's just customer fulfillment. If somebody asks for something and gets it, they certainly have no gripe that they didn't give consent to get what they asked for. So, Your Honor, Judge Pragerson, you're right. It's a whole new world out there, and this is an area where technology and telecommunications has surpassed some of the legal precedent out there. But as this court has made clear, courts are supposed to apply common sense in these cases. That's the Cheeseboro versus Best Buy case because there are so many unusual circumstances or different factual circumstances. And if you apply common sense to this case, there are people who saw the ad and affirmatively responded and got a text message. And by calling, that's giving prior express consent. So there's no class here. If somebody wants to have a one-off claim for a misdial, they're free to do that. But there's no way to derive a class out of this. And if the court has no more questions, I'm happy to yield my time. Close out and send no more. Thank you very much. No, no, I was not. I think you're out of time. Well, you cited the Walmart case. Yes, Judge Callahan brought up, I think, Pinkard or something like that versus Walmart. I believe that's what was referred to. Class action. It was a class action. Yeah. And you know whose case that was? It was mine. In a dirtier day's work, the Supreme Court never has done before. Thank you, Your Honor. Okay. All right.
judges: Pregerson, Callahan, Hurwitz